1
2
3
4
5
6
7
8               UNITED STATES DISTRICT COURT
9               CENTRAL DISTRICT OF CALIFORNIA
10
11
12   SANDEEP HANS,                          Case No. CV 14-02760-AB (MRWx)

13              Plaintiff,

14   v.                                      **FINDINGS OF FACT AND
                                             CONCLUSIONS OF LAW**
15   UNUM LIFE INSURANCE
     COMPANY; E & J GALLO WINERY
16   LONG TERM DISABILITY PLAN,             **TRIAL DATE: APRIL 7, 2015**

17              Defendants.

18

19          This Employment Retirement Income Security Act ("ERISA") action concerns

20   the termination of Plaintiff Sandeep Hans's long-term disability ("LTD") benefits and

21   life waiver of premium (LWOP) benefits, pursuant to 29 U.S.C. § 1132 *et seq.*  (*See*

22   Complaint, Dkt. No. 1.)  Plaintiff seeks to overturn the termination of his ERISA-

23   governed benefit plans (collectively the "Policy").  Defendant Unum Life Insurance

24   Co. ("Unum"), acting on behalf of Plaintiff's former employer Defendant E & J Gallo

25   Winery ("Gallo") terminated Plaintiff's disability benefits.

26          On March 9, 2015, the Parties submitted Opening Briefs.  (Plaintiff Brief

27   ("PB"), Dkt. No. 45; Unum Brief ("UB"), Dkt. No. 46.)  The Administrative Record

28   ("AR") was also submitted on March 9.  (AR, Dkt. No. 44.)  On March 23, 2015, the

1.

1    Parties submitted Responsive Briefs.  (Plaintiff Response ("PR"), Dkt. No. 52; Unum

2    Response ("UR"), Dkt. No. 53.)  On March 31, the Parties submitted Findings of Fact

3    and Conclusions of Law.  (Unum ("UFL"), Dkt. No. 55; Plaintiff ("PFL"), Dkt. No.

4    56.)  The Court, sitting without a jury, commenced a bench trial on April 7, 2015.

5    (Bench Trial, Dkt. No. 60.)

6          Having heard oral argument and having considered the materials submitted by

7    the Parties, the Court finds for Unum under the following findings of fact and

8    conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

9    **I.      FINDINGS OF FACT[1]**

10         1.     This Court has jurisdiction of this ERISA matter pursuant to 29 U.S.C.

11   §§ 1132(a), (e), (f), (g), and 28 U.S.C § 1331.  The matter concerns a dispute over

12   Plaintiff's benefit plans.

13     **A.   The Policy**

14         2.     On January 1, 2000, Unum, acting on behalf of Defendant E & J Gallo

15   Winery, issued the Group LTD Policy Number 54954001 (the "LTD Policy").[2]  On

16   May 1, 2004, Unum amended the LTD Policy (amended as the "LTD Plan").  (AR 57-

17   97.)

18         3.     To qualify for benefits under the LTD Policy, Unum must determine that

19   you are disabled.  To prove that you are disabled, one must prove:

20         [Y]ou are limited from performing the material and substantial duties of your
21         regular occupation due to your sickness or injury; and

22         [Y]ou have a 20% or more loss in your indexed monthly earnings due to the
23         same sickness or injury.

24   _____

25   [1] All facts cited herein are taken from the AR unless otherwise noted.  (*See* AR.)  Any finding of fact
     that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of
26   law that constitutes a finding of fact is hereby adopted as a finding of fact.

27   [2] The LTD Plan claim file is found at AR 1-5116, the Base Life Plan claim file is found at AR 5117-
     6317, and the Supplemental Life Plan claim file is found at AR 6318-6964.  (PFL, pp. 1-2.)
28

(AR 837.)

4.      The LTD Policy continues to note that

after twenty-four (24) months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any *gainful occupation* for which are reasonably fitted by education, training or experience.

(AR 837 (emphasis added).)  "Gainful Occupation is one that within 12 months of your return to work is or can be expected to provide you with an income that is at least equal to 60% of your annual earnings in effect just before your date of disability began."  (AR 6315, 6962.)

5.      Unum will also evaluate the disability while one is working in another occupation.

After 24 months of payments, Unum defines Another Occupation as: You will be determined to be disabled from another occupation when you are rendered unable to engage with reasonable continuity in another occupation in which you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, physical and mental capacity.

(AR 837.)

6.      Unum will stop sending you disability payments and your claim will end on the earliest of the following:

- All full-time active salaried employees who: Are working at least 40 hours per week; have one year or more of service with a covered employer; qualify for sick leave; and are not covered under a collective bargaining agreement, All full-time active salaried employees who: Are working at least 40 hours per week; have less than one year of service with a covered employer; qualify for sick leave; and are not covered under a collective bargaining agreement

- During the first 24 months of payments, when you are able to work in your

3.

1    regular occupation on *a part-time basis* but you choose not to;[3]

2    • After 24 months of payments, when you are able to work in any gainful

3    occupation on a part-time basis but you choose not to;

4    • the end of the maximum period of payment;

5    • the date you are no longer disabled under the terms of the plan;

6    • the date you fail to submit proof of continuing disability;

7    • the date your disability earnings exceed the amount allowable under the plan; or

8    • the date you die.

9    (AR 79-80, 837 (emphasis added).)

10        7.      Unum's life insurance policies are Group Life Policies Number 549454

11   002 with a benefit of $200,000 ("the Base Life Policy") and Number 549454 002 with

12   a benefit of $100,000 ("the Supplemental Life Policy").  (AR 6283-6317; 6919-6964.)

13        8.      The Life Policies provide LWOP when an insured is disabled from any

14   gainful occupation up to age 65.  (AR 6302, 6945.)  The Life Policies allow

15   conversion of coverage within thirty-one (31) days after employment terminates.  (AR

16   6303-6307, 6946-6953.)

17   **B.   Diagnosing Plaintiff**

18        9.      From January 1999 to May 2002, Plaintiff worked as a computer

19   programmer for Gallo.  (AR 100, 121, 2809); (PFL ¶¶ 5-6.)  The occupation of

20   "programmer/analyst" is rated "sedentary" in physical strength demand.  (UFL ¶ 21.)

21   Plaintiff's job duties as a programmer/analyst at Gallo required sitting 5 hours a day,

22   standing 2 hours a day and walking 1 hour a day, lifting up to 20 pounds, and

23   frequently lifting less than 10 pounds.  (UFL ¶ 22.)

24        10.     Plaintiff earned a yearly salary of $71,000 until the date of his disability,

25   May 8, 2002.  (AR 11, 100, 349); (PFL ¶ 7.)  Plaintiff's disability symptoms consisted

26

27

28   [3] Part-time means the ability to work and earn 20% or more of your indexed monthly earnings.

4.

of vertigo, fatigue, memory and concentration complaints, anxiety and depression. (AR 2706-3205.)

### i. Dr. Donald Howe and Dr. C. Alan Yates's Attempt To Diagnose Plaintiff

11. On May 2, 2002, Dr. Donald Howe treated Plaintiff for stiffness and soreness on his neck, body fatigue, and forgetfulness leading to nervousness. (AR 224); (PFL ¶ 10.) On May 7, 2002, Dr. Howe conducted an objective examination and a MRI on Plaintiff. (AR 229.) The results came back normal. (AR 173); (PFL ¶ 12.) Plaintiff was referred to a neurologist. (AR 229.) A neurological examination was taken and the results also came back normal. (AR 255-6.)

12. On May 20, 2002, Plaintiff returned back to Dr. Howe's office to be examined by a nurse. (PB 2.) The nurse noted that Plaintiff's symptoms were "bad enough that he is unable to work. He really wants to go back to work." (AR 240.) The nurse referred Plaintiff to have a ear, nose, and throat consultation (ENT).

13. Dr. C. Alan Yates is an ENT specialist. On May 29, 2002, Dr. Yates examined Plaintiff using an audiogram. The results showed that Plaintiff had mild hearing loss. (AR 280.)

14. On June 20, 2002, Dr. Howe completed Unum's Attending Physician Statement. (PB 3.) Due to Plaintiff's symptoms of dizziness, pain, and fatigue, Dr. Howe opined that Plaintiff was totally disabled. (AR 102.) The diagnosis confirmed Plaintiff's vertigo, otitis media (ear infection), and fatigue symptoms. (AR 102.) Dr. Howe stated Plaintiff could return back to full-time work by July 1, 2002. (*Id.*)

15. On June 28, 2002, Plaintiff returned back to Dr. Howe. (AR 193.) Due to Plaintiff's symptoms, Dr. Howe ordered Plaintiff to remain off work until August 1, 2002. (AR 199.)

16. In July 3, 2002, a bilateral carotid artery color doppler sonography came back normal. (AR 167.)[4]

---

[4] Dr. Kevin Mckennan is also a physician who assisted Dr. Howe in evaluating Plaintiff. (AR 192.) Plaintiff's insurance did not approve the consultation with Dr. McKennan, so Plaintiff elected to pay

**ii. Dr. Russell Porter (Primary Physician) Begins to Treat Plaintiff and Plaintiff Seeks Treatment in India**

17. On October 25, 2002, Plaintiff began treating with Dr. Russell Porter, another physician in Dr. Howe's office. (AR 2928); (PFL ¶ 51.) Plaintiff informed Dr. Porter he was ready to return back to work. (*Id.*) Dr. Porter cleared Plaintiff to return back to work on November 1, 2002, and Plaintiff began working again on that day. (*Id.*) However, because of his symptoms, Plaintiff stopped working on November 7, 2002. (AR 384.)

18. Because Plaintiff's symptoms continued to persist, Plaintiff sought treatment in India from November 18, 2002 to January 31, 2003. (AR 383.) Dr. Ramakant Jagpal certified Plaintiff's need for rest during that period. (*Id.*) Subsequently, Plaintiff returned to the U.S. and resumed treatment with Dr. Porter in June 2003. (AR 617-618.)

**iii. Dr. James Wakefield's Psychological Testing**

19. To ensure that Plaintiff's symptoms were not cognitive, on August 11, 2003, Dr. James Wakefield conducted a psycho-diagnostic evaluation. (AR 1340.) Dr. Wakefield pointed to Plaintiff's difficulty in performing minimal activities including driving his son to school, walking the dog, helping his son study, and watching his children play. (AR 1340.) Dr. Wakefield continued to opine about Plaintiff's mood being "frustrated" because of his condition and inability to work. (AR 1341.) The results showed Plaintiff's intellectual ability to be in the average percentile. (AR 1343.)

20. After receiving results from the evaluation, Dr. Porter still found little explanation for Plaintiff's symptoms. Dr. Porter noted that anti-depressants were

---

cash in order to get another opinion in the hope of finding the cause of his symptoms. (PFL ¶ 37.) Dr. Mckennan conducted a few neurological exams and could not find evidence of serious pathology. (AR 322.) Dr. McKennan concluded "[t]here is not much we can do to alleviate the symptoms." (PFL ¶ 46.)

going to be prescribed to rule out somatization, which is a chronic disorder where psychological distress produces physical symptoms.[5,6]  (AR 494); (PFL ¶¶ 76-77.)

### iv.   The Social Security Administration's Finding that Plaintiff is Disabled

21.   On March 1, 2004, the Social Security Administration ("SSA") determined Plaintiff had been disabled since May 7, 2002.  (AR 564.)  Dr. Susan Regan reviewed Plaintiff's medical records and concluded that Plaintiff suffered a loss in intellectual abilities.  (AR 3008.)  She also reviewed Dr. Wakefield's tests and concurred with his results.  (*Id.*)  The SSA medical consultant, Dr. Howard Crutcher, agreed with Dr. Regan's assessment.[7]  (AR 3109.)

### C.   Plaintiff is Diagnosed with Chronic Fatigue Syndrome (CFS) and Unum Determines Plaintiff is Disabled

22.   On October 1, 2004, Dr. Porter diagnosed Plaintiff with "chronic vertigo, and [CFS]."[8]  (AR 675.)  After the diagnosis, Plaintiff filed a claim with Unum but was initially denied because his claim file only consisted of subjective complaints.  (AR 2486.)  Plaintiff and his attorney supplemented his claim with various specialists' opinions and evaluations.[9,10]

---

[5] There is evidence within the Administrative Record that Plaintiff ignored using this prescribed medication.  (AR 4366-4367.)

[6] *See* MEDLINE PLUS, National Institute of Health, http://nlm.nih.gov/medlineplus/ency/article/000955.html (last visited April 4, 2015).

[7] In 2006, the SSA began to reassess Plaintiff's disability claim. (AR 2732); (PFL ¶ 104.)  On May 9, 2007, the Social Security Administration's C.H. Dudley, M.D. reviewed all of Plaintiff's medical information.  (AR 2711, 3129); (PFL ¶ 111.)  Dr. Dudley found that Plaintiff was unable to shop, mow lawns, or take long drives.  (AR 3129.)  Because Plaintiff had experienced "no significant medical improvement," Dr. Dudley recertified disability.  (*Id.*); (PFL ¶ 112.)

[8] The reason Plaintiff took a litany of tests to rule out other possible diagnoses is because of the lack of objective testing that can diagnose CFS.  *Solomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir. 2011).  Thus, procedures of ruling out other potential ailments (as done here) are the key indicators of identifying CFS.  *Id.*

[9] In 2006, the SSA began to reassess Plaintiff's disability claim.  (AR 2732-39, 1740-47.)  On behalf of SSA, Dr. C.H. Dudley reviewed the updated information provided to them and concluded that

23.     On May 9, 2007, Unum reassessed Plaintiff's claim and concurred that Plaintiff suffered from CFS.  (AR 2486.)  After completing the review of the file, Unum sent a letter to Plaintiff to confirm Plaintiff's disability as of May 8, 2002 thereby retroactively awarding him disability benefits as of that date.  (AR 837.)

**D.     Unum's Initial Medical Review**

24.     As part of Unum's ongoing handling of the claim, it requested an update on Plaintiff's medical status to determine if he remained eligible for continued benefits under the Plan's provisions.  (AR 838); (PFL ¶ 123.)

25.     In the Claimant's Statement Plaintiff completed on July 8, 2008, he described his present activities: "On better (good) days → drop off/pick up kids from school, go to stores with spouse/dad. Help kids with homework, baby sit youngest son when feeling better, walk outside in evening/play with kids in front of house in evening."  (AR 2599); (PFL ¶ 130.)

26.     In June 2009, Unum "determined that we need updated certification of your continued disability."  (AR 2608); (PFL ¶ 133.)  Plaintiff provided all requested information. (AR 2613-19.)

27.     In the forms Unum provided, Plaintiff described his current day-to-day activities as "[o]n better days, drop off kids/pick up kids from school, go to shopping with Dad. Help kids with homework, babysit the youngest son, take kids to park, evening walk, sit/play with kids outside of house in evening." (AR 2614); (PFL ¶ 134.)

28.     In 2011, Unum began investigating Plaintiff's ongoing entitlement to LTD/LWOP.  (AR 2673, 2687, 3216.)  The investigation first focused on Plaintiff's

---

Plaintiff suffered from CFS and recertified their previous finding of disability.  (AR 2714.)

[10] Plaintiff was referred to other physicians in order to confirm the diagnosis.  Dr. Roger Morrison, homeopathic medicine physician, and Dr. Gregory Melcher, assistant professor at U.C. Davis Department of Internal Medicine, also concluded that Plaintiff suffered from CFS.  (AR 684, 1154, 1168.)

depression and anxiety symptoms that was opined in Dr. Porter's reports. [11]   (AR 3216.)

29.     On December 1, 2011, Plaintiff confirmed that in 2008 or 2009 he was referred to Dr. Epperson for a psychiatric evaluation during his divorce. [12]   (AR 3225-26.)  Unum claims that it attempted to follow up on Dr. Epperson's evaluation, but Plaintiff's attorney blocked Unum's investigation.  (AR 3229-31, 3237-39, 3255-56, 3231.)

30.     Between July 2008 to August 2011, Dr. Porter filled out Attending Physician Statements ("APS") in order to provide Unum with Plaintiff's updated health information.  (AR 2601, 2617, 2641, 2648.)  The APS stated the following:

- On July 2, 2008, Dr. Porter reported that the primary diagnosis was CFS and secondary diagnosis of vertigo.  (AR 2601-02.)

- On July 15, 2009, Dr. Porter's diagnosis did not change.  Dr. Porter opined that Plaintiff was able to sit frequently (34%-66%) and stand/walk occasionally (1-33%).  (AR 2617.)

- On July 26, 2011, Dr. Porter's diagnosis and opinion did not change from July 2009.  (AR 2641.)

- August 31, 2011, Unum requested copies of Plaintiff's medical records.  (AR 2648.)  Dr. Porter faxed treatment notes from December 2010 and July 2011.

(*Id.*)

31.     On September 7, 2011, Unum called Plaintiff to discuss his claim.  (AR 2665.)  According to Plaintiff, he was able to cook dinner or take care of kids by transporting them to and from school on good days.  (AR 2636-2640; 2666.)  Plaintiff

---

[11] LTD benefits for disabilities due to mental illness are limited to twenty-four (24) months ("M&N Limitation").  (AR 80-81.)

[12] Within the AR, there are statements alluding to Plaintiff's wife poisoning him with arsenic.  (AR 4830, 4833.)

9.

1   informed Unum that he was seeing Dr. Porter every six (6) months and he expressed

2   his desire to return back to work one day.  (*Id.*)

3        32.    Based on Dr. Porter's APS above, on September 19, 2011, Unum

4   determined that Plaintiff could perform sedentary work.  (AR 2673.)

5        33.    The following Unum physician reviews were conducted in 2012 while

6   Unum was still paying Plaintiff's disability benefits.

7   **i.   Dr. Peter Gannon's Independent Medical Examination**

8        34.    Dr. Peter Gannon, M.D., is board-certified in neurology and internal

9   medicine.  (AR 3296-3297, 4338-4378.)  In March 2012, Unum sent over Plaintiff's

10  medical records.  (AR 4365-4378.)  On March 12, 2012, Dr. Gannon conducted an in-

11  person Independent Medical Examination ("IME") of Plaintiff.  (*Id.*)

12       35.    In his March 15, 2012 report, Dr. Gannon concluded that Plaintiff did not

13  suffer from vestibular disorder.  (*Id.*)  Plaintiff's physical and mental status exams all

14  came back normal.  (AR 4368 (noting that Plaintiff scored a 30 out of 30 on a mini-

15  mental exam).)  Based on Plaintiff's medical records, lab studies, MRIs, blood tests,

16  etc., Dr. Gannon found no neurological disease or restrictions and limitations.  (AR

17  4369 ("I am unable to find [any] objective evidence of any neurologic disease which

18  has resulted in disability.").)  However, Dr. Gannon was aware that Plaintiff "has

19  marked difficulty concentrating on anything for more than a short period of time."

20  (AR 4366); (PFL ¶ 171.)

21       36.    Dr. Gannon noted that Plaintiff had not been on any medication for

22  several years, contrary to Dr. Porter's anti-depressant prescriptions.  (*Id.*)  Dr. Gannon

23  also opined that Plaintiff "certainly...has multiple chronic symptoms," which might be

24  caused by depression.  (AR 4369); (PFL ¶ 169.)

25       37.    Unum sent Dr. Gannon's report to Dr. Porter and requested Dr. Porter

26  send updated records.  (AR 4401-4402.)  Dr. Porter sent Unum an office visit note that

27  indicated that Plaintiff was having good and bad days with regard to his chronic

28

fatigue problems.  (AR 4406.)  Dr. Porter expected Plaintiff to be a year away from full recovery.  (*Id*.)

38.    Unum forwarded the updates to Dr. Gannon, but the new information did not change his position.  (UFL ¶ 90); (AR 4416, 4423-4424.)

**ii.   Dr. Larry LaClair**

39.    Unum's on-site physician, Dr. Larry LaClair, a board certified family medicine physician, also reviewed Plaintiff's records.  (AR 4453-63; 4465-4474.)  In June 2012, Dr. LaClair reported that Plaintiff's vestibular neuritis improved.  (AR 4472.)  Dr. LaClair concluded that Plaintiff was able to sit frequently and stand/walk occasionally.  (AR 4462); (PFL ¶ 178.)   Dr. LaClair attempted to discuss Plaintiff's condition with Dr. Porter, but Dr. Porter did not respond.  (AR 4445-4447.)  According to Dr. LaClair, Plaintiff had full time functional capacity and he agreed with Dr. Gannon's assessment.  (AR 4474.)

40.    Dr. LaClair noticed that Plaintiff's CFS and depression and anxiety had serious overlap.  (*Id*.)  Dr. LaClair wanted to examine more thoroughly Plaintiff's mental condition, but Plaintiff's counsel has refused to produce Dr. Epperson's evaluation.

**iii.   Dr. Malcolm Spica**

41.    Dr. Malcolm Spica is Unum's on-site clinical neuropsychologist and licensed clinical psychologist.  (AR 4483-4487.)  On July 11, 2012, Dr. Spica reviewed Plaintiff's medical records and concluded that Plaintiff did not suffer from any neurocognitive restrictions and limitations from 2002 to the date of the review.  (*Id*.)  He stated that Dr. Wakefield's testing indicated normal cognitive performance and Dr. Regan's opinions were purely based on Plaintiff's subjective complaints.  (*Id*.)  Dr. Spica also stated that Dr. Epperson's psychological evaluation of Plaintiff would have been helpful.  (*Id*.)

11.

### iv. Dr. Joseph Sentef

42.     On July 16, 2012, Unum referred Plaintiff's medical file to Dr. Joseph Sentef, M.D., board certified family and occupational medicine physician.  (AR 4488-4493.)  Dr. Sentef concluded that Plaintiff's activities—regularly exercising, driving, actively studying and playing with his children—were inconsistent with impairing fatigue.  (*Id*.)  He determined that CFS cannot be found under these circumstances. (*Id*.)  Reviewing Dr. Porter and Dr. Gannon's reports, Dr. Sentef opined that Plaintiff had full-time light work capacity.  (*Id*.)

### v. Unum's Vocational Analysis

43.     On July 24, 2012, Unum conducted a vocational analysis of Plaintiff. (AR 4436; 4501-4505.)  Considering the skills, abilities, education, work history, and medical history of Plaintiff, Unum concluded that Plaintiff has the functional ability to work at different suitable gainful occupations such as Computer Sales Representative, Auditor, Statistical Analyst, and a Manager of Merchandise.[13]  (*Id*.)  All the positions were either sedentary or light work positions because of Plaintiff's medical history. (*Id*.)  The vocational report also opined that the alternative positions would require vocational adjustment of two (2) years.  (AR 4504.)

44.     The vocational  analysis expressly stated that "[n]o special training, licensure or certification would be needed for the vocational alternatives." The vocational consultant confirmed that these occupations were available in Plaintiff's geographical area of Modesto and that they are performed with "occasional exertion up to 10 lbs and 20 lbs of force, frequent sitting with occasional stand/walk and climb stairs, kneel, bend/twist/stoop."  (UFL ¶ 102.)  It was also noted that the examples were not a complete list of occupations Plaintiff could perform.  (*Id*.)  The vocational

---

[13] Plaintiff has a bachelors and master's degree in computer science.  (AR 122, 1340); (PFL ¶ 1.) These alternative positions reflect Plaintiff's educational background.

consultant confirmed that the alternatives would allow Plaintiff to demonstrate a level of skills and achievement consistent with pre-disability work.  (*Id*.)

### E.   Unum's Denial of Plaintiff's Benefits and Plaintiff's Appeal

45.   On July 31, 2012, Unum terminated Plaintiff's LTD benefits.  (AR 4517-4526.)  On August 2, 2012, Unum terminated Plaintiff's LWOP benefits.  (AR 6127-6132.)  Based on the medical and vocational evidence above, Unum concluded that Plaintiff was no longer disabled in accordance with its LTD and Life Policies.  (AR 4510, 4512.)  Unum determined that Plaintiff's symptoms did not prevent him from working.  (AR 4518, 4530.)

46.   In March 2013, Plaintiff appealed Unum's decision with an updated record from Dr. Porter.  (AR 4799; 4987-5003); (PFL ¶¶ 195-196.)

47.   The updated record included Dr. Porter's Chronic Fatigue Syndrome Residual Functional Capacity Questionnaire which confirmed the existence of Plaintiff's previous symptoms.  (AR 4851-52.)  Among the other assessments that were inconsistent with a return to work, Dr. Porter opined that Plaintiff needed 20-30 minute breaks every hour (4853) and would be absent from work more than four days per month (4854).  (PFL ¶ 205.)

48.   In consideration of the administrative record and the examinations of the physicians below, Unum upheld its termination decision under the LTD Policy and Life Policies.

49.   Unum communicated the denials to Plaintiff on June 20, 2013.  (AR 5044-5056, 6259-6271, 6898-6910.)  Unum explained the basis for its decision in a letter detailing that Plaintiff did not have physical restrictions and limitations precluding work in other gainful occupations.  (UFL ¶ 119.)  Unum explained that Plaintiff's conditions, collectively and individually, did not indicate he was precluded from engaging with reasonable continuity in the alternative gainful occupations previously identified by Unum's vocational staff.  (*Id*.)  Unum distinguished the SSA award, refuting the CFS diagnosis in light of several co-morbid conditions and

Plaintiff's inconsistent reporting of substance abuse, and also noting that Unum had more current information.[14]  (*Id*.)

50.    In upholding its decision, Unum considered the Dr. Porter's updated opinions and the additional medical reviews below.  (*Id*.)

**i.    Cardiopulmonary Exercise Test**

51.    Plaintiff produced a cardiopulmonary exercise testing (CPET) report[15] which is an exam he took in February 2013.  (AR 4855-66);(PFL ¶ 208.)  The testing is designed to determine whether Plaintiff's subjective complaints of fatigue are consistent with observable signs of physical impairment.  (AR 4861);(PFL ¶ 210.)

52.    Plaintiff's CPET results were primarily based on self-report.  (UFL ¶ 113; (AR 4856-5857, 4860, 4866.)  The testing was designed to determine whether Plaintiff's subjective complaints of fatigue were consistent with observable signs of physical impairment.  (PFL ¶ 210.)

53.    The two-day exercise test determined that Plaintiff is "severely limited in his ability to engage in normal activities of daily living and [should be] [precluded] from full-time work of even a sedentary/stationary nature."  (AR 4855); (PFL ¶ 212.)

54.    The letter upholding the termination of Plaintiff's benefits does not reflect Unum addressing the CPET findings in substantial detail.  (PFL ¶ 228.)

---

[14] "By the time Unum upheld the final appeal, Plaintiff had reported improvement, resumed driving, took his kids to/from school, gymnastics and karate, helped with homework, rode bikes, watched television and movies, used a computer, went shopping, played with them, went on evening walks, did sit ups, and sat outside in evenings. He cared for himself and did not need assistance with ADLs. Plaintiff  had resumed cooking and caring for his kids."  (UFL ¶ 122 (citing AR 2614, 2636, 2658, 2665-2666).)

[15] According to Plaintiff and the Workwell Foundation, "CPET is considered the gold standard for measuring and evaluating functional capacity and fatigue. Position statements and/or guidelines for the performance of this testing are available from the American College of Sports Medicine, American Heart Association, American College of Chest Physicians, American Thoracic Society and the American Medical Association, among others."  (AR 4856); (PFL ¶ 211.)

### ii.   Dr. Porter's August 2012 Medical Reports

55.   On August 7, 2012, after Plaintiff mentioned that his benefits were terminated, Dr. Porter encouraged Plaintiff to "re-engag[e] the workforce and see if [Plaintiff] does not get back to his normal self."  (AR 4844.)

56.   The next day Dr. Porter completed a Chronic Fatigue Syndrome Residual Functional Capacity Questionnaire.  (AR 4851-54); (PFL ¶ 201.)  There, Dr. Porter confirmed the presence of CFS symptoms, opined that Plaintiff could sit for 2 hours at a time for a total of about 4 hours in a day, and opined that Plaintiff was limited to standing about 15 minutes at a time for a total of less than 2 hours in a day. (AR 4851-4853); (PFL ¶¶ 202-203.)

### iii.   Dr. Jana Zimmerman

57.   In May 2013, Dr. Jana Zimmerman, a licensed psychologist, reviewed Plaintiff's records and concluded that cognitive deficits from a non-behavioral health condition were not supported.  (AR 5010-5019); (UFL ¶ 115.)

58.   Dr. Zimmerman noted that many of Plaintiff's symptoms may be derivative of his history of substance abuse.  (AR 5010-5019.)  Dr. Zimmerman attributes a majority of Plaintiff's symptoms to his drinking habits.  (*Id*.)  According to Dr. Zimmerman, Plaintiff had been drinking 3-4 whiskeys daily for 2 years.  (*Id*.) The pattern of alcohol intake met the diagnostic criteria for alcohol abuse if not dependence, which is often associated with his symptoms.  (UFL ¶ 115.)  Dr. Zimmerman also noted that Plaintiff's memory and concentration complaints followed drinking heavy enough to cause a hangover the next day.  (*Id*.)

### iv.   Dr. Scott B. Norris

59.   In May 2013, Unum physician, Dr. Scott B. Norris, also reviewed Plaintiff's records and agreed that Plaintiff did not meet the criteria for CFS.  (AR 5020-5029); (UFL ¶ 117.)

60.   Specifically, Dr. Norris stated "[w]ith a reasonable degree of medical certainty, I find that the medical evidence supports that the insured had the physical

1  capacity, as of 7/30/12 forward, to perform sustain, full-time (40 hours/week) 'Light'

2  occupational activity . . . ."  (AR 5025.)

3  **v.   Plaintiff Brings this Federal Action**

4         61.    As a result of Unum's final ruling, Plaintiff commenced this action on

5  April 10, 2014.  (*See* Compl.)

6  **II.   CONCLUSIONS OF LAW**

7         1.    The Court conducts a bench trial on the record, [16] evaluating the

8  persuasiveness of the arguments and deciding which is more likely true.  *Kearney v.*

9  *Standard Ins. Co.*, 175 F.3d 1084, 1094-95 (9th Cir. 1999).  A court reviews a plan

10  administrator's decision *de novo* "unless the benefit plan gives the administrator or

11  fiduciary discretionary authority to determine eligibility for benefits;" if the plan does

12  grant such discretionary authority, the Court reviews the administrator's decision for

13  abuse of discretion.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115,

14  109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Salomaa v. Honda Long Term Disability*

15  *Plan,* 637 F.3d 958, 965 (9th Cir. 2011).

16         2.    On September 16, 2014, the Court granted the Parties' stipulation for a *de*

17  *novo* standard of review.  (Dkt. No. 31.)

18         3.    Under the *de novo* standard of review, the Court gives no deference to

19  Unum's decision in terminating Plaintiff's benefits.  *Muniz v. AMEC Constr. Mgmt.*,

20

21  ─────────────────

[16] On March 23, 2015, Unum filed a Motion to Strike Plaintiff's Extrinsic Evidence.  (Dkt. No. 54.)
22  Plaintiff filed an Opposition.  (Dkt. No. 57.)  Unum filed a Reply.  (Dkt. No. 59.)  The Motion
moves to strike Plaintiff's Exhibit, (Dkt. No. 45, Ex. B), which is a "Unum Estimated Abilities
23  Form."  The Ninth Circuit has emphasized that a district court should exercise discretion before
considering extrinsic evidence and considering extrinsic evidence is permitted only when such
24  evidence is necessary to conduct an adequate review of the benefit decision.  *Opeta v. Nw. Airlines*
*Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (citation omitted).  The
25  Policy term and the definition at issue is sedentary work.  In order to properly review the Policy
decision, the Court finds it necessary to examine the Plaintiff's Exhibit, (Dkt. No. 45, Ex. B).
26  However, the Court also examines Unum's exhibit, Norma Parras's Declaration, (Dkt. No. 59-1), to
properly interpret this plan term from two different perspectives.  The Court therefore **DENIES**
27  Unum's Motion and considers this extrinsic evidence because this evidence is necessary "regarding
[the] interpretation of the terms of the plan . . . ."  *Id.*
28

623 F.3d 1290, 1295-96 (9th Cir. 2010) ("When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan.").

4.     A plan administrator like Unum must adequately explain the reasons for the denial of benefits, or in this case, the reversal of benefits previously provided.  *See* 29 U.S.C. § 1133 ("every employee benefit plan shall . . . provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant"); *see also* 29 C.F.R. § 2560.503–1(h)(2)(iv) (providing that "claims procedures [must] [p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination").

5.     "When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures."  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 974 (9th Cir. 2006). But, "[i]n an ERISA case involving de novo review, the plaintiff has the burden of showing entitlement to benefits."  *See Schramm v. CAN Fin. Corp. Insured Grp. Ben. Program*, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010); *see also Muniz v. AMEC Constr. Mgmt.*, No. CV-07-8066 CAS (AJWx), 2009 WL 866843, at *5 (C.D. Cal. 2009) ("The parties dispute which party bears the burden of proof in this case. Generally, a plaintiff suing for benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B), must establish his entitlement to benefits." citing *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir. 1992)).

6.     The Court analyzes the record anew and "evaluate[s] the persuasiveness of conflicting testimony and decides which is more likely true."  *Kearney*, 175 F.3d at

1   195.  The review is limited to the evidence in the administrative record unless it

2   necessary to consider extrinsic evidence outside of the record.  *Opeta v. Nw. Airlines*

3   *Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007).

4             **A. Discussion**

5             The policy places the burden on Plaintiff to qualify for benefits.  To prove that

6   you are disabled, one must prove:

7        [Y]ou are limited from performing the material and substantial duties of your

8        regular occupation due to your sickness or injury; and

9        [Y]ou have a 20% or more loss in your indexed monthly earnings due to the

10       same sickness or injury.

11   (AR 837.)  In reviewing the Administrative Record and the Parties' contentions,

12   Plaintiff has not satisfied his burden to establish that he was disabled throughout the

13   relevant time period.  As a preliminary matter, the Court finds it necessary to shed

14   light on the difficulties of assessing ERISA cases involving CFS.

15             **i.    Chronic Fatigue Syndrome**

16             CFS is a subject of discussion and debate within this district.  *Holifield v.*

17   *UNUM Life Ins. Co. of America*, 640 F.Supp.2d 1224 (C.D. Cal. 2009) (ruling against

18   the plaintiff when considering her CFS diagnosis); *Whealen v. Hartford Life and Acc.*

19   *Ins. Co.*, No. CV06-4948PSG (PLAX), 2007 WL 1891175 (C.D. Cal. 2007) (holding

20   that the defendant abused its discretion in evaluating the plaintiff's CFS); *Salomaa v.*

21   *Honda Long Term Disability Plan*, 542 F.Supp.2d 1068 (C.D. Cal. 2008) (affirming

22   the administrator's denial of the plaintiff's LTD benefits considering his CFS),

23   *reversed and remanded en banc denied*, 642 F.3d 666 (9th Cir. 2011) (holding

24   administrator abused its discretion in denying long-term benefits to claimant who

25   suffered from CFS).  There is a "lively debate as to whether 'there is a single cause or

26   many causes [of CFS] and whether the cause is physical or psychologic[al]."

27   *Holifield*, 640 F.Supp.2d at 1234 (citations omitted.).  Irrespective of the CFS origins,

28   the Court recognizes that the very nature of CFS causes a person to experience

extreme fluctuation in his or her symptoms.  *See* Dr. Majid Ali, Chronic Fatigue

Syndrome, http://www.fibromyalgia-support.org/chronic-fatigue/cfs-definition.html

(last visited April 3, 2015) ("CFS is a progressive immune disorder which affects all

body organs and ecosystems.").  Understanding that CFS tends to either progress or

regress over time, the Court is very mindful of the demarcation between suffering

from CFS and CFS rendering one disabled.  *See Denmark v. Liberty Life Assurance*

*Co. of Boston*, 481 F.3d 16, 37 (1st Cir. 2007) (highlighting the difference between

"requiring objective evidence of the diagnosis, which is impermissible for a

condition . . . that does not lend itself to objective verification, and requiring objective

evidence that the plaintiff is unable to work, which is allowed."); *Fitzpatrick v. Bayer*

*Corp.*, No. 04 Civ. 5134, 2008 WL 169318, at *11 (S.D.N.Y. 2008) ("[T]he operative

question in this case is not whether Plaintiff actually suffered from CFS and/or

fibromyalgia, but instead whether the Plaintiff's CFS and/or fibromyalgia rendered

her 'totally disabled' . . . and thus unable to work.").

Thus, the issue before the Court is whether Plaintiff's medical condition *and* the

effect of that condition rendered him disabled within the definition of the Policy.  The

Court next summarizes the Parties' contentions.

### ii.    Summary of the Parties' Arguments

The Parties agree that Plaintiff was entitled to receive benefits from the Plans in

May 2007 (the date Unum retroactively approved Plaintiff's benefits from May 2002)

up to May 2012, due to the symptoms associated with CFS.  (AR 837, 2486.)  This

means that Plaintiff was in fact disabled from May 2002 to July 2012 (termination of

LTD benefits) and August 2012 (termination of LWOP benefits).  (AR 837); (AR

4517-4526); (AR 6127-6132.)  The dispute arises from Unum's termination of those

benefits.

According to Plaintiff, Unum cannot point to significant medical evidence that

suggests Plaintiff's condition has improved warranting Unum to terminate his benefits.

(PB 19.)  Plaintiff challenges Unum's termination of his benefits because when Unum

1   received Plaintiff's updated medical records, Unum decided to continue Plaintiff's

2   benefits.  (PB 20.)  The updated medical records included Dr. Porter's July 2008,

3   2009, and 2011 APS reports where he informed Unum that Plaintiff was able to

4   frequently sit, occasionally stand, walk and lift/carry up to 20lbs.  (AR 2601-02, 2617,

5   2641, 2648.)  Plaintiff claims that these CFS symptoms did not change from July 2008

6   to August 2011 which means Unum must have relied on evidence that demonstrates a

7   significant improvement in Plaintiff's condition in order to terminate his benefits.  (PB

8   20.)  But Plaintiff contends that the significant improvement is absent here.  Plaintiff

9   points the Court to Dr. Porter's medical evaluations and the CPET test which is the

10  test Plaintiff believes is the most important piece of evidence in evaluating Plaintiff's

11  condition.  According to Plaintiff, Unum ignored the CPET test and did not seriously

12  consider its findings before terminating Plaintiff's LTD benefits.  (PB 21.)

13        According to Unum, it relied on a significant improvement in Plaintiff's

14  condition justifying termination of the Policy.  (UB 19.)  Unum contends that its

15  doctors reviewed Plaintiff's claims and concluded that the medical record did not

16  support Plaintiff's CFS diagnosis.  (UB 20.)  Particularly, Unum focuses on Dr.

17  Gannon who examined Plaintiff in-person and confirmed that Plaintiff had no

18  neurological condition or restrictions and limitations.  (*Id.* at 22.)  Moreover, Unum's

19  vocational analysis concludes that Plaintiff could work in "other gainful occupations

20  including computer sales, IT auditor and systems analyst."  (*Id.* at 20.)  Lastly, Unum

21  points out that the CPET is very inconsistent with the administrative record and

22  should not be relied upon as objective evidence.  (UR 2.)

23        **iii.   Plaintiff's Condition Has Significantly Changed**

24        Viewing the record through the lens of *de novo* review, the Court finds that

25  Plaintiff has significantly improved compared to when he was first diagnosed with

26  CFS.[17]

27  _____

28  [17] As a threshold matter, it is true that Unum may provide evidence to support its decision to
    terminate Plaintiff's benefits because it has approved Plaintiff's benefits in the past.  *Schramm*, 718

The Court reminds Plaintiff "[t]hat a person has a true medical diagnosis does not by itself establish disability . . . . Sometimes [peoples'] medical conditions are so severe that they cannot work; sometimes people are able to work despite their condition; and sometimes people work to distract themselves from their conditions." *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 880 (9th Cir. 2004), *overruled in part on other grounds*, *Abatie*, 458 F.3d at 969 (9th Cir. 2006); *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability.  A claimant bears the burden of proving that an impairment is disabling.").  In other words, the fact that Plaintiff has CFS, on its own, does not mean that he is disabled.  Instead, it is the presence of ongoing disabling symptoms resulting from CFS that support the reversal of Unum's decision.  *Cf. Corry v. Liberty Life Assurance Co. of Boston*, 499 F.3d 389, 401 (5th Cir. 2007) (finding administrator's actions proper where it accepted diagnosis of fibromyalgia, but did not accept claim of disabling effects of the condition).

The CFS diagnosis and the ongoing CFS symptoms are no longer present here which evinces significant improvement.

Focusing on the diagnosis, there is a question as to whether Plaintiff's symptoms derive from CFS or Plaintiff's mental health issues.  It is difficult for health care providers to diagnose CFS, as no specific laboratory tests or biomarkers exist. *Denmark*, 481 F.3d at 37 ("[W]hile the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illness do lend themselves to objective

---

F. Supp. 2d at 1164 ("Although Defendant did not need to prove a material improvement in Plaintiff's condition to defeat her entitlement to benefits, her lack of consistent, marked progress is probative of her continuing disability." (citing *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871 (9th Cir. 2008))).  But paying benefits in the past does not operate as an estoppel or transfer the burden of proof onto the insurer.  *Inciong v. Fort Dearborn Life Ins. Co.*, 2014 WL 1599513 *2 (9th Cir. 2014) (unpublished) (affirming benefits denial after 15 years of payments based on improved condition).  And even if it did, the corresponding record satisfies that very burden of significant improvement.

1   analysis." (quoting *Boardman v. Prudential Ins. Co. of America*, 337 F.3d 9, 17 n. 5
2   (1st Cir. 2003))). "Depression is often present as a secondary disorder in CFS
3   patients; when it appears to be present, the CDC recommends a referral to a mental
4   health professional." *Holifield*, 640 F.Supp.2d at 1235 (citing CDC, "Treatment
5   Options," http://www.cdc.gov/cfs/cfstreatment HCP.html). Here, Unum's brief cites
6   to several events from Plaintiff's past that question whether Plaintiff suffers from CFS
7   or depression. (AR 5010-5019.) The events include Plaintiff's divorce, his history of
8   substance abuse in Dr. Zimmerman's diagnosis, and there are also statements in the
9   record that allude to Plaintiff's ex-wife allegedly poisoning him with arsenic. (*Id*.)
10  Under these circumstances, there is a possibility Plaintiff suffers from mental health
11  issues, including depression, in addition to CFS (or possibly, rather than CFS).
12      The Court understands that it is not in a position to firmly diagnose Plaintiff
13  with or without CFS. However, in looking at the record, the Court notices that several
14  physicians have concluded that Plaintiff may no longer have CFS. (AR 4471 (Dr.
15  LaClair stating that the absence of certain symptoms "indicates that if [Plaintiff] [had]
16  chronic fatigue syndrome between 2005-2007, it has improved and no longer meets
17  the 1994 CDC criteria for this condition."); AR 5025-27 (Dr. Norris stating that "the
18  diagnosis of CFS is not supported as of 7/30/12.").) That in of itself is an
19  improvement and a significant change from 2002 to 2008 when Plaintiff's condition
20  was at its worst. During that period (2002 to 2008), Plaintiff's physicians were
21  attempting to identify the cause of Plaintiff's symptoms and Dr. Porter (Plaintiff's
22  treating physician) ultimately diagnosed Plaintiff with "chronic vertigo, and [CFS]" in
23  2004, (AR 675), and Unum approved Plaintiff's benefits in 2007. (AR 2486) Then
24  between 2008-2013, when Unum's doctors began reviewing Plaintiff's condition and
25  his past substance abuse, they began to question his overall diagnosis. (AR 4490-
26  4491 (in summarizing Plaintiff's symptoms, Dr. Sentef states that "[Plaintiff] has
27  demonstrated fairly good activity and his symptoms do "not appear to be consistent
28  with CFS"); AR 5010-5019 (Dr. Zimmerman concluding that Plaintiff's cognitive

1   deficits are a result of his past substance abuse).)  Because Plaintiff's CFS diagnosis is

2   indiscernible by several physicians listed above, when in the past other physicians

3   concluded Plaintiff suffered from CFS, the Court finds that to be evidence of a

4   significant improvement.  And even putting that aside, there are still grounds to find

5   for Unum when assessing Plaintiff's symptoms.

6            During 2002 to 2008 (when Plaintiff's condition was at its worst), Plaintiff had

7   extreme fatigue in performing daily chores like exercising or even driving his son to

8   school.  (AR 2735 (in 2006, a function report Plaintiff filled out for the SSA in which

9   he indicated that he did not have physical strength to do chores around the house); AR

10  2737 (same report, Plaintiff indicating that he can watch movies in parts); AR 2743

11  (same function report stating on some days "[Plaintiff] can, for a short amount of time

12  [take] kids [to] school [which] is 3-4 blocks away. . . .").)  Plaintiff's symptoms

13  consisted of vertigo, fatigue, memory and concentration complaints, anxiety and

14  depression.  (AR 2706-3205.)  Many physicians concurred that Plaintiff was suffering

15  tremendously from his ailment.  For example, Dr. Howe opined that Plaintiff was

16  totally disabled due to Plaintiff's symptoms of dizziness, pain, and fatigue.  (AR 102.)

17  Dr. Yates reported that Plaintiff had hearing loss.  (AR 280.)  Dr. Regan found that

18  Plaintiff suffered a loss in intellectual abilities.  (AR 3008.)  And Dr. Porter also

19  concurred that Plaintiff symptoms were becoming increasingly burdensome to his

20  overall lifestyle and because Plaintiff's testing for other illnesses came back negative,

21  Dr. Porter diagnosed Plaintiff with CFS in 2004.  (AR 675.)  Because Dr. Porter (for

22  example) is Plaintiff's treating physician, his evaluations are generally entitled to

23  greater weight than that of the non-treating physician.  *See Murray v. Heckler*, 722

24  F.2d 499, 501-502 (9th Cir. 1983).  But, as the Ninth Circuit has explained in the

25  social security context, a physician's (especially a treating physician) opinion may be

26  rejected "for 'clear and convincing' reasons supported by substantial evidence in the

27  record."  *Orn v. Astrue,* 495 F.3d 625, 632 (9th Cir. 2007).  Such reasons include

28  where an opinion is "in the form of a checklist, did not have supportive objective

1    evidence, [or] was contradicted by other statements and assessments of [the patient]'s

2    medical condition."  *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1195 (9th

3    Cir. 2004); *see also Tuttle v. Standard Ins. Co.*, 459 F.Supp.2d 1063, 1072 (W.D.

4    Wash. 2006) (noting insurer "was not required to give special weight to [claimant's]

5    treating physicians, particularly where their opinions were mere unsupported

6    conclusions").  Here, there are several indications of unreliability in the opinions

7    supporting Plaintiff's position which justify Unum's termination decision.

8         First, the symptoms described by Dr. Porter's in the 2012 Residual Functional

9    Capacity Questionnaire differ from other evaluations in that same timeframe.[18]  (AR

10   4851-4852 (Residual Functional Capacity Questionnaire filled out in August 2012

11   diagnosing Plaintiff with CFS vertigo and using checked boxes to identify Plaintiff's

12   symptoms as muscle pain and multiple joint pain)); *cf.* (AR 4845-4846 (Dr. Porter's

13   June 2012 progress note that states that Plaintiff denies vertigo, joint pain, muscle

14   pain, joint swelling, and muscle cramps).)  These contradictions (that are made several

15   months from each other) draw into question the reliability of Plaintiff's symptoms.

16   Second, it is Dr. Porter who encouraged Plaintiff to reengage in the workforce.  (AR

17   4844 (Dr. Porter stating that Plaintiff should  "try to step up and work hard at getting

18   better, improving, [and] re-engag[e] the workforce and see if [Plaintiff] does not get

19   back to his normal self.").)  If Plaintiff's treating physician is encouraging him to

20   return to work, then the Court questions why Plaintiff has not made any attempt to

21   engage back in the workforce.  There is no evidence in the record that Plaintiff has

22   made any attempt to go back to work since 2002.  A persuasive set of circumstances

23   would be for one to present evidence of an effort to reengage in the workforce and

24

25   [18] It noteworthy to inform the Parties that the Court only looks to Plaintiff's medical record that was
26   reviewed in terminating Plaintiff's benefits.  The entire record does provide context and perspective.
     But it is what Plaintiff's symptoms were at the time (June 2009, (AR 2608; PFL ¶ 133), and beyond)
27   Unum requested Plaintiff's updated medical records and whether those updated medical records
     were consistent with Plaintiff's past symptoms that guide the Court's decision here.
28

1  then failing in that attempt due to a medical condition.  It is an entirely different (and

2  unpersuasive) set of circumstances to present no evidence of an attempt to work again.

3      Moreover, the record and Unum's physicians provide consistent findings that

4  Plaintiff did not continuously suffer from CFS symptoms which are known to be

5  disabling.  The several doctors that reviewed Plaintiff's medical file for Unum: Drs.

6  Gannon, Spica, LaClair, Sentef, Zimmerman, and Norris.  They reviewed the

7  information in Plaintiff's file, including Dr. Porter's reports.  (AR 4483-4487 (Dr.

8  Spica); AR 4453-63, 4465-4474 (Dr. LaClair; AR 4488-4493 (Dr. Sentef); AR 5010-

9  5019 (Dr. Zimmerman); AR 5020-5029 (Dr. Norris).)  Dr. Gannon conducted an in-

10  person medical exam.  (AR 4365-4378.)  Dr. Gannon reviewed the file, conducted the

11  IME on Plaintiff, and found no objective evidence supporting a disability.  (AR 4369

12  ("I am unable to find [any] objective evidence of any neurologic disease which has

13  resulted in disability.").)  This conclusion is similar to Unum's other consulting

14  physicians that concluded that Plaintiff was not totally disabled and did not suffer

15  from CFS after reviewing the medical record.  (AR 4471 (Dr. LaClair stating that

16  Plaintiff's symptoms no longer meet CDC criteria); AR 5025-27 (Dr. Norris noting

17  that the CFS diagnosis is no longer present); (AR 4490-4491 (Dr. Sentef stating the

18  same).)  Although Unum's medical examiners ultimately contradicted Plaintiff's

19  treating physicians and Plaintiff's other medical support, Unum had every right to rely

20  on and give substantial weight to such opinions in making its final decision.  *Andrews*

21  *v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) ("Where the opinion of the claimant's

22  treating physician is contradicted, and the opinion of a nontreating source is based on

23  independent clinical findings that differ from those of the treating physician, the

24  opinion of the nontreating source may itself be substantial evidence; it is then solely

25  the province of the ALJ to resolve the conflict"); *Saelee v. Chater*, 94 F.3d 520, 522

26  (9th Cir. 1996) (per curium) (as amended) (holding that "the findings of a nontreating,

27  nonexamining physician can amount to substantial evidence, so long as other evidence

28  in the record supports those findings"); *Hunt v. Metropolitan Life Insurance Company*,

425 F.3d 489, 490– 91 (8th Cir. 2005) ("Although we are mindful of [the plaintiff's] self- reported complaints of extreme tiredness, fatigue, mental confusion, loss of memory, anxiety attacks, and depression, and the opinion of Hunt's treating physician that RLS has rendered her totally disabled, MetLife was nevertheless entitled to rely on the opinions of two reviewing physicians who gave contrary opinions."); *see also Conti v. Equitable Life Ins. Assurance Society*, 227 F.Supp.2d 282, 292 (D.N.J. 2002) (concluding that an insurer's decision to deny benefits was not an abuse of discretion where it elected to accept the opinion of the physician who performed an independent medical review rather than the reports of plaintiff's treating physicians); *DiPietro v. Prudential Ins. Co. of America*, No. 03 C 1018, 2004 WL 626818, at *6 (N.D. Ill. 2004) ("Insurance providers are not required to seek independent medical evaluations, but an evaluation by the insurer is evidence of a thorough investigation into the claim").

It is also necessary to address Plaintiff's contentions with respect to the CPET examination. Plaintiff asserts that he did provide Unum with an objective medical evaluation called the CPET which according to Plaintiff, Unum did not accord sufficient weight to the CPET results in its decision to uphold its termination decision. Plaintiff contends that Unum is required to consider the CPET examination in its appeal of Plaintiff's benefits, and because the CPET test is hardly mentioned in the record, Plaintiff concludes that the CPET was not adequately considered in upholding the termination of Plaintiff's benefits. It is true that Unum is required to give the CPET consideration in evaluating Plaintiff's record, but that is exactly what happened here—the CPET was considered. (AR 4988 (a portion of Unum's appeal file review stating "[i]n support of [Plaintiff's] appeal, the attorney submitted . . . a 3/19/13 'Workwell Foundation Cardiopulmonary Exercise Test Evaluation Report'. . . ."); AR 5024 (Unum's appeal file review that outlines a timeline of events including the "[CPET] (two tests): 15 Watt/min bicycle ergometry w/ expired gas collection was performed; . . . 'abnormal' reduction in submaximal oxygen consumption between

26.

1    two tests noted . . . .").)  These CPET references in Unum's appellate review were not

2    overly elaborate nor did Unum fully explain its reasoning for disagreeing with the

3    CPET results.  But, there is no authority that Plaintiff points to that explicitly requires

4    Unum to explain, point by point, why it disagreed with the CPET evaluations

5    disagreements.  Because the CPET is the so-called "gold standard" does not mean that

6    Unum is somehow obligated to elaborate on what it believes is flawed with the CPET

7    examination.  Furthermore, in reviewing the record, such flaws are apparent for two

8    major reasons.  First, this evaluation was not conducted by a licensed physician, rather

9    it is Plaintiff's subjective complaints that the CPET relies upon.  (AR 4856-5857,

10   4860, 4866.)  Plaintiff underwent a two-day exercise examination to which he, himself,

11   recorded his results.  (AR 4860 ("A post exercise test log was maintained by the

12   patient."); AR 4866 (an example of an exercise recovery questionnaire that Plaintiff

13   filled out.)  There is no indication that a physician was present nor is there anything

14   in the record that suggests any physician (including Dr. Porter) supports the CPET's

15   findings.  The Court sees no fault on the part of Unum for disagreeing with an

16   examination this is primarily based on self-reporting.  Second, the physical therapy

17   evaluation included findings inconsistent with a finding of Dr. Porter's prior

18   evaluations.  (AR 4840 (On a February 6, 2013 note, Dr. Porter stated "[Plaintiff] is

19   instructed to exercise regularly."); *cf*. (AR 4855 (CPET March 19, 2013 evaluation

20   that concludes that based on the two-day exercise test, Plaintiff is "severely limited in

21   his ability to engage in normal activities of daily living. . . .").)  In one particular

22   month, if Dr. Porter's medical evaluations are saying Plaintiff should exercise

23   regularly, and the following month, the CPET results are saying Plaintiff is severely

24   limited in his ability to engage everyday activities (which likely includes exercising),

25   then the Court finds that such an inconsistency weighs heavily against the reliability

26   Plaintiff's medical evaluations.  Ultimately, the Court believes Unum rationally found

27

28

the CPET results incredible in speaking to the disabling effect CFS had on Plaintiff.[19]
*See*, *e.g.*, *Lown v. Continental Casualty Co.*, 238 F.3d 543, 546 (4th Cir. 2001) (on *de novo* review, upholding the denial of benefits for disability based on chronic fatigue and pain notwithstanding the opinions of three treating physicians where the insurer "determined that [the claimant's] documentation was inadequate to prove a total disability because of the lack of test results or other objective evidence to support the disability").

### iv. Plaintiff is Not Incapable from Working in a Gainful Occupation

The Administrative Record is clear that Unum's primary reason for terminating Plaintiff's benefits is because Unum disputes the impact CFS has on Plaintiff's ability to perform sedentary work. The Court finds that the medical file supports Plaintiff's ability to perform sedentary or light work.

The Parties are in dispute as the amount of time in one workday sedentary occupations require one to sit. Plaintiff contends that Unum may have relied on (or at least was aware of) sedentary definition that is attached to a "Unum Estimated Abilities Form" in which the form explicitly defines sedentary work as sitting "6/8 hours." (Dkt. No. 45, Ex. B.) Unum and Dr. Porter determined that Plaintiff could sit "frequently" and stand/walk "occasionally." (AR 4520.) According to Plaintiff's exhibit, Unum defines Frequently sitting as the ability to sit somewhere in between

---

[19] The Court also wishes to address the SSA determination. Although the Parties spend little time discussing the issue, the Court recognizes that Unum is not bound by the SSA's determination and Unum is not subject to the same standards applied to SSDI awards. *See*, *e.g.*, *Seleine v. Fluor Corp. Long-Term Disability Plan*, 598 F.Supp.2d 1090, 1104 (C.D. Cal. 2009) ("The Ninth Circuit has long held, however, that an SSA award is not binding on an administrator.") (citations omitted). Dr. Reagan and Dr. Dudley may have determined Plaintiff to be disabled, but this determination does not provide anything more than the conclusion that Plaintiff was disabled at the time of his examination in 2004 and in 2007. (AR 2711, 3008, 3129.) There is nothing in the record that suggests that the SSA reevaluated Plaintiff's claim following these dates. Therefore, whether the SSA found Plaintiff disabled in 2004 and in 2007 has no bearing on Unum's determination that Plaintiff was no longer disabled under the terms of the Policy.

34% (2.72) and 66% (5.28) hours in a work day, 8 hours.  (Dkt. No. 45, Ex. B.)  If 5.28 hours is the maximum amount of time Plaintiff can frequently sit, then Plaintiff cannot perform sedentary work if Unum relied on this exhibit in making its decision to terminate Plaintiff's benefits.[20]  Unum rejects the assertion that it relied on this definition in terminating Plaintiff's benefits because the form is no longer in use. (Bench Trial, 3:11-15 ("[Plaintiff's exhibit] was nothing Unum relied on or considered in adjudicating Mr. Sandeep Hans's claim."); 5:22-25 ("[T]hat form is no longer in use at Unum and it was not in use at the time of the vocational reviews that were done in May and July of 2012.").)  Unum also contends sedentary work cannot be so easily quantified.  More specifically, Unum attaches a declaration from a vocational rehabilitation consultant at Unum who elaborates on the uniform definition of sedentary work (if any).  (Norma Parras Potenzo, Dkt. No. 59-1.)  Ms. Potenzo states that the widely accepted vocational definition of sedentary work is consistent with Unum's definition of frequent sitting.  (*Id.* at ¶ 6 ("In conducting my analyses in Plaintiff's claim, I followed the widely accepted vocational definition of "sedentary" work that generally requires the ability to sit frequently . . . .").)  In other words, sedentary requires one to sit between 2.72 hours to 5.28 hours, instead of the 6 hour minimum Plaintiff proposes.  (*Id.*)

The Court sees no reason to quantify the minimum amount of hours one is required to sit in order to perform sedentary work because the record demonstrates that Plaintiff can perform in such an environment.  As noted above, it appears that Plaintiff has significantly improved in his average daily activities which supports the

---

[20] Plaintiff cites numerous cases to support the uniform definition of sedentary work as having the ability to sit six (6) hours within an eight (8) hour work day.  *See, e.g., Alfano v. Cigna Life Ins. Co. of New York*, 07 Civ. 9661 (GEL), 2009 WL 222351, at *18 (S.D.N.Y. 2009) (noting that a sitting tolerance of "6 hours per day [is] generally recognized as the minimum tolerance required for sedentary work" according to the Department of Labor); *see also Perryman v. Provident Life & Accident Ins. Co.*, 690 F. Supp. 2d 917, 948 (9th Cir. 2010) (elaborating on "sedentary work, as defined by the [Department of Labor's] Dictionary of Occupational Titles, 'involves sitting most of the time. . . .'").  None of these examples are in the ERISA context.

proposition that Plaintiff is no longer disabled and ready to begin working again.  As noted in Dr. Sentef's 2012 evaluation Plaintiff was improving and performing average daily activities.  (AR 4491 (Dr. Sentef noting that by 2011 Plaintiff was "able to participate in regular exercise" and that Plaintiff could "walk and ride bicycles daily").) And these improvements were expected.  (AR 4406 (2011 letter from Dr. Porter stating that "I do feel that [Plaintiff] is a year or so away from his maximum recovery."); AR 4851 (August 2012 Residual Functional Capacity Questionnaire to which Dr. Porter states that Plaintiff's fatigue "peaked in 2008" and is "slowly improving" now.).)  The Court believes that based on the number of household duties Plaintiff currently performs coupled with the fact that Dr. Porter has encouraged him to start working again, Plaintiff does have the ability to perform sedentary work.  As mentioned above, Plaintiff has not attempted to work at a another sedentary job since 2002 during his time at Gallo.  His improvement in household chores and overall health signify that it is time for Plaintiff to extend his daily living abilities to a sedentary work environment.  Plaintiff should not avoid what is apparent—it is time to "re-engag[e] the workforce."  (AR 4844.)

The record, the policy, and the Parties' arguments do not support the assertion that Plaintiff was disabled as of July 2012 (termination of LTD benefits) and August 2012 (termination of LWOP benefits).  The Court therefore has no alternative other than to affirm Unum's decision to deny Plaintiff's benefits.

///

///

///

///

///

**III.    CONCLUSION**

For the foregoing findings of fact and conclusions of law, the Court finds that under *de novo* review, Plaintiff has not established, by the preponderance of the evidence, that he was disabled under the Policy.  The Court therefore affirms the denial of Plaintiffs LTD benefits.  Unum shall submit a proposed judgment no later than fourteen (14) days of the issuance of this decision.  Once the proposed judgment is submitted, Plaintiff shall have five (5) days to file his objections.  Each side is to bear their own costs.

**IT IS SO ORDERED.**

Dated:  October 5, 2015          _____

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE